## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

CASE NO. 2:21-cv-00280-JLB-KCD

GENAS RETIREMENT HOME,
INC.,

      Plaintiff,

v.

SCOTTSDALE INSURANCE
COMPANY,

      Defendant.

_____/

## DEFENDANT, SCOTTSDALE INSURANCE COMPANY'S MOTION FOR FINAL SUMMARY JUDGMENT ON ITS LATE NOTICE DEFENSE, AND, IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIMITATION OF DAMAGES UNDER THE POLICY

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Middle District of Florida Local Rule 3.01 and the Court's Case Management and Scheduling Order (D.E. 19) and Amended Case Management and Scheduling Order (D.E. 41), Defendant Scottsdale Insurance Company ("Scottsdale") moves for final summary judgment on its late notice affirmative defense based on Plaintiff's failure to timely notify Scottsdale of Plaintiff's supplemental claim. Alternatively, Scottsdale moves for partial summary judgment that Plaintiff's recoverable damages under the policy are limited to the costs it incurred to repair wind-related damages to its buildings.

**INTRODUCTION**

In February 2021, the Plaintiff, Genas Retirement Home, Inc., sued Scottsdale for breach of a property insurance policy, policy number CPS2734760 ("the Policy), insuring three commercial residential buildings located at 4280 Desoto Avenue in Fort Myers, Florida (the "Property"), relating to Plaintiff's claim for damage to the buildings from Hurricane Irma.  Although the Plaintiff promptly reported the loss to Scottsdale on September 18, 2017, the Plaintiff did not promptly notify Scottsdale of any dispute with Scottsdale's claim decision until March 24, 2020, over 2 years later, after the Plaintiff had made numerous undocumented repairs to the buildings' roofs and interiors.  The interceding repairs and other weather events during the time before the Plaintiff made its supplemental claim prejudiced Scottsdale's ability to determine any additional wind damages to the Property from Hurricane Irma.  Therefore, Scottsdale is entitled to final summary judgment that the Plaintiff failed to provide "prompt notice" to Scottsdale of the Plaintiff's supplemental claim, which violated the notice conditions of the Policy and prejudiced Scottsdale's investigation.

Alternatively, if this Court does not grant summary judgment to Scottsdale on its late notice defense, Scottsdale moves for partial summary judgment that the Plaintiff's recoverable damages under the Policy are limited to the actual costs the Plaintiff incurred to make Hurricane Irma related repairs to the buildings prior to her sale of the Property in July 2022.  The Plaintiff no longer has any financial interest in the Property and will not make any future repairs of alleged wind damage to the buildings, such as replacing the roofs.  Therefore, pursuant to the policy conditions and

Florida law, the Plaintiff's recovery under the Policy for its Hurricane Irma loss is limited to the amount it spent to repair the damaged property, less the applicable wind deductibles.

## STATEMENT OF MATERIAL FACTS

1.      This is a first-party breach of insurance contract action initiated by the Plaintiff on February 2, 2021. *See* D.E. 1-A, Complaint.

2.      Plaintiff alleges in the Complaint that Scottsdale breached the Policy by failing to pay the full amount of insurance benefits allegedly due to Plaintiff as a result of Hurricane Irma damage to its commercial residential buildings on the Property). *Id.* at ¶¶ 5-8.

3.      Scottsdale was served with Plaintiffs' Complaint on March 5, 2021, and timely removed the action to this Court on April 1, 2021 based on the Court's diversity jurisdiction. *See*, D.E. 1, Notice of Removal.

4.      The alleged date of loss is September 10, 2017—the date Hurricane Irma impacted the Property. *See* D.E. 1-A, Comp., ¶ 7.

5.      The Policy has a policy period of September 9, 2017 to September 9, 2018. A true and correct copy of the Policy is attached to the Declaration of Scottsdale's Corporate Representative, David Gee ("Gee Declaration"). *See* Gee Declaration attached hereto as **Exhibit "A"** at ¶ 4, Ex. 1.

6.      The limits of insurance for the buildings insured under the Policy are $550,000 for Building 1, $367,000 for Building 2, and $433,000 for Building 3. *See* Ex. A, Ex. 1, Commercial Property Coverage Part Supplemental Declarations.

7.      Scottsdale was first notified of the Plaintiff's Hurricane Irma loss on September 18, 2017. *See id.* at ¶ 5.

8.      During her deposition as the designated corporate representative for the Plaintiff, Gena Acksbersingh testified that she did not take any photographs of the damages to the Property she observed after Hurricane Irma.  *See* Deposition of Gena Acksbersingh attached as **Exhibit "B"** at p. 14:2-4, 15:19-20.

9.      Scottsdale assigned an independent adjuster who inspected the Property with a roof consultant on or about September/October 2017 and again in January 2018. *See* Ex. A at ¶ 7.

10.     Based on the inspections by the independent adjuster and roof consultant, their reports, photographs and estimate, Scottsdale issued a claim determination letter to the Plaintiff on March 13, 2018, advising that the Policy covered wind damage observed to the roofs of the three buildings on the Property, subject to the wind deductibles for each building, but excluded coverage for any damaged caused by surface water or interior rainwater damage that was not the result of an opening in the roof or walls caused by a covered cause of loss.  The letter stated that payment for the loss would be issued and sent separately in accordance with the independent adjuster's estimate, less the Policy's wind deductibles, as follows:

> Building 1: Net Payment of $0 based on the independent adjuster's estimate of $7,593.51, less the $11,000 wind deductible.

> Buildings 2 and 3: Net payment of $1,275.34 after the $7,340 wind deductible for Building 2 and $8,660.00 wind deductible for Building 3)

*See* Ex. A at ¶ 8, 9 and Ex. 2.

11.     Ms. Acksbersingh testified that she received a copy of the claim determination letter and recalled receiving one payment, which she did not cash.  *See* Ex. B at 37:15-23.

12.     Thereafter, Scottsdale closed the claim. *See* Ex. A at ¶ 10.

13.     On or about March 24, 2020, over two years after Scottsdale closed the claim, the Plaintiff's public adjuster, United Claims Adjusters, notified Scottsdale of the Plaintiff's supplemental claim for Hurricane Irma damage to the buildings.  This was the Plaintiff's first notice to Scottsdale since March 2018 that the Plaintiff disputed Scottsdale's adjustment of the amount of loss to the Property from Hurricane Irma. *See* Ex. A at ¶ 11.

14.     Ms. Acksbersingh testified she did not contact United Claims Adjusters until early 2020. *See* Ex. B at 41:1-5.

15.     On April 20, 2020, Scottsdale mailed a Reservation of Rights letter to the Plaintiff and its public adjuster, reserving rights under the "Duties In The Event Of Loss Or Damage" and "Concealment, Misrepresentation Or Fraud" conditions of the Policy with respect to the supplemental claim. *See* Ex. A at ¶ 12 and Ex. 3.

16.     The Reservation of Rights letter stated that because the supplemental claim was not made to Scottsdale until 898 days after the storm, and the Policy expired September 9, 2018, Scottsdale did not know whether all damages claimed are related to this event or occurred during the policy period. *Id.*

17.     The Policy requires the insureds to provide Scottsdale with "prompt notice" of any loss or damage to the Property: "**3. Duties In The Event Of Loss Or**

**Damage** a. You must see that the following are done in the event of loss or damage to Covered Property: (1) . . . (2) Give us prompt notice of the loss or damage . . . (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. ... However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss." *See*, Ex. A at Ex. 1, Policy, Form CP 00 10 10 12, p. 10-11 of 16.

18.     Ms. Acksbersingh testified that after the loss, she called a roofer who "came and did some work. He had to come back and do some more patching up and sealing up and things like that so that we can, you know, prevent more damages." *See* Ex. B at 15:22-25; 16:1-13.

19.     Ms. Acksbersingh testified that for the roof work, she "paid in cash, check or [she would] go to his bank and deposit money" and that she could "probably come up with those payments." *Id.* at 16:20-25; 17:1-2.

20.     Ms. Acksbersingh testified she had the roof patched after the hurricane "maybe three or four times." *Id.* at 41:12-15.

21.     Ms. Acksbersingh testified she had a mitigation company "who came in and did some drying up" and that she "probably" has documents related to this. *Id.* at 17:3-9.

22.     Ms. Acksbersingh testified repairs to the ceiling of the units affected were done by the property maintenance individual, Manny Loria, "and another guy," but

that she does not have documents evidencing the interior repairs. *Id.* at 28:20-25, 29:1-4; 31:5-11; 32:5-16; 33:22-25; 34:18-22.

23.     Ms. Acksbersingh testified she never had an estimate for damages for the initial Hurricane Irma damages because she had Manny, and that "when the guy tried to repair, you know, temporarily fix the roof, he had been having more water leaks, so he started fixing the inside." *Id.* at 35:1-6.

24.     Ms. Acksbersingh testified she did not cash the indemnity payment received from Scottsdale because she did not "think that was a fair amount that they sent me." *Id.* at 37:24-25, 38:1.

25.     Ms. Acksbersingh did not recall all units that were repaired but did recall that repairs were done to the roof of each building. *Id.* at 38:10-16.

26.     When asked why Ms. Acksbersingh waited two years to retain a public adjuster, she testified she did call someone but that she had some family concerns (relatives passed) and "eventually said I need to get someone." *Id.* at 39:8-25, 40:1-9.

27.     Ms. Acksbersingh testified that damage still exists from the hurricane to the roofs of all three buildings, specifically "whatever the adjuster came up with because I did not go up to the roof." *Id.* at 38:24-25, 39:1-7.

28.     Ms. Acksbersingh testified when she called the public adjuster to come out, it was the "same damage." *Id.* at 40:21-25.

29.     Ms. Acksbersingh testified there was no active leak at the Property, but there were still damages. *Id.* at 11:24-25.

30.     United Claims Adjusters prepared an estimate dated July 30, 2020, which included the costs to repair interior water damages to certain units and to replace the roofs on the three buildings, totaling $343,118.81 at replacement cost. *See* D.E. 1-I.

31.     Plaintiff's expert, Jose Sanchez of T&E Group, Inc., also prepared an estimate of the costs to repair the buildings totaling $380,980.43 at replacement cost. A copy of the T&E Group 5/27/2022 estimate was marked as Exhibit "2" to Mr. Sanchez's Deposition Transcript, attached hereto as **Exhibit "C."**

32.     Ms. Acksbersingh testified she is seeking around $300,000 in damages from Scottsdale in this case. *See* Ex. B at 47:16-19.

33.     Scottsdale retained a structural engineer, Nazario Ramirez ("Mr. Ramirez") of Donan Engineering, who inspected the Property on April 19, 2022. *See* Deposition of Nazario Ramirez, attached hereto as **"Exhibit D"** at 11:14.

34.     Mr. Ramirez opined that most of the torn, missing, and creased shingles he observed throughout the roofs on the Property are consistent with wind uplift damage, but he could not determine due to the passage of time and numerous prior repairs when damage to individual shingles occurred.  Mr. Ramirez testified, "[t]here is no mention of was this due to Tropical Storm Eta, Irma, Wilma. Everything was encompassed." *See* Ex. D at 57:23-25; 58:1-5.

35.     Mr. Ramirez testified "there has [sic.] been multiple windstorm events affecting the subject property and multiple repairs throughout the years. So basically, this contaminated the scene for us to determine a specific causation. Specifically, the – there is evidence of damage to the roof covering back in 2006 after a hurricane event

and aerial photograph provides evidence that some of these areas were not repaired and some were repaired. There's also a track issue and there's multiple repairs throughout the years, it's not just one repair. So, all of this basically contaminated the roof covering scene for us to study." *See* Ex. D at 23: 15-25; 24: 1-3.

36.     Mr. Ramirez "tallied everything that was consistent with wind uplift damage independent of if it occurred during Wilma or Irma or any other storm event, everything was counted. Everything was tallied, everything was recorded and documented and provided in both the figure and the table" in his report. *See* Ex. D at 57:12-17.

37.     Mr. Ramirez testified he does not believe it is possible to determine when the wind uplift damage to portions of the roof occurred because there have been "multiple repair attempts to the roof coverings throughout all buildings contaminating what was originally there after the storm." *See* Ex. D at 61:14-22.

38.     Mr. Ramirez testified he also observed repairs to the roofs "consistent with repair activities done improperly." *See* Ex. D at 75:20-25; 76:1-3.

39.     Mr. Ramirez testified that the cause of repaired water damage on the interiors of multiple units was undeterminable due to ceiling and roof repairs performed prior to and after Hurricane Irma.  He opined that the color of the stains indicates the water intrusion at these locations has occurred for a long period (years). *See* Ex. D at 23:12-19; 40:7-9.

40.     Although both Plaintiff's expert engineer, Sivakumar Munuswamy, and Mr. Ramirez identified wind damages to the roofs of the Property, Mr. Munuswamy

testified: "I'm not saying all the damages [in the roofs] are attributable to the wind because we observed creased shingles adjacent to the temporary repairs, so those things are attributable to the temporary repairs because the shingles are nonpliable. And we also saw some of the nonconformance repairs that – so I'm not saying all these damages that I observed on this roof are exclusively due to wind. I did not say that." *See* Part 1 of the Deposition of Sivakumar Munuswamy, attached hereto as **"Exhibit E"** at 130:4-15.

41.     Mr. Munuswamy testified he agreed with Mr. Ramirez's conclusions on damages consistent with wind. *See* Ex. E at 41:20-24.

42.     Further, Mr. Munuswamy testified "there are posterior wind events to the 2017 [hurricane] and once you have wind caused damages subsequent wind events, not comparable to the wind event that happened on 2017, to cause similar enough damages [to] that one. . . Once you've had a compromise, [it starts] deteriorating." *See* Ex. E at 38:9-14, 22-23.

43.     Mr. Munuswamy also testified that "at some locations, the temporary repairs, the damaged shingles were replaced with nonconforming materials leaving the roof vulnerable for the damage." *See* Ex. E at 40:24-25; 41:1-2.

44.     The Policy's Loss Payment provision states in relevant part: "We will not pay you more than your financial interest in the Covered Property." *See* Ex. A at Ex. 1, Form CP 00 10 10 12, pg. 11 of 16.

45.     According to the Commercial Property Coverage Part Supplemental Declarations, valuation for the three buildings insured under the Policy is at "Replacement Cost." *See* Ex. A at Ex. 1.

46.     The Policy provides in relevant part as follows: "**G. Optional Coverages.** If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item: . . . **3. Replacement Cost** . . . d. We will not pay on a replacement cost basis for any loss or damage: (1) Until the lost or damaged property is repaired or replaced; and (2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage. . .  e. We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2), or (3), subject to f. below: (1) The Limit of Insurance applicable to the lost or damaged property; (2) The cost to replace the lost or damaged property with other property . . . (3) The amount actually spent that is necessary to repair or replace the lost or damaged property. . ." *See* Ex. A at Ex. 1, Form CP 00 10 10 12, pg. 15 of 16.

47.     Ms. Acksbersignh testified she sold the property "as is" in July of 2022 for $2.7 million. *See* Ex. B at 11:3-17; 12:1-2.

48.     Ms. Acksbersignh testified she did not replace the buildings' roofs before she sold the property; the roofs still had damage from Hurricane Irma. *See* Ex. B at 11:18-25, 47:20-23.

49.     Ms. Acksbersignh testified she was not aware of whether the purchasers of the Property knew of any issues with the roofs and specifically stated, "I told them I'm selling it as is. I'm not fixing anything." *See* Ex. B at 47:24-25, 48:5-16.

PD.40412449.1

50.     Ms. Acksbersignh testified she originally purchased the property for $1.3 million. *See* Ex. B at 49:20-22.

## MEMORANDUM OF LAW

### Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The function of the trial court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  A genuine factual dispute exists if "a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999).  Under this standard, the Court "draws all reasonable inferences in the light most favorable to the nonmoving party." *Id.*  If the moving party satisfies its burden of showing that there is no genuine issue of material fact, the nonmoving party must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

### Policy Interpretation Rules

"Because federal jurisdiction over this matter is based on diversity, Florida law governs the determination of" matters related to the construction of the insurance contract at issue in the lawsuit. *See Hegel v. First Liberty Ins. Co.*, 778 F.3d 1214, 1220 (11th Cir. 2015); *see also PDQ Coolidge Formad, LLC v. Landmark Am. Ins. Co.*, 566 Fed.

Appx. 845, 847 (11th Cir. 2014) (citing *State Farm Mut. Auto. Ins. Co. v. Duckworth*, 648 F.3d 1216, 1218 (11th Cir. 2011)) (Florida courts apply the law of the jurisdiction in which the contract was entered into). A "guiding principle" of Florida law is "that insurance contracts are construed in accordance with 'the plain language of the polic[y] as bargained for by the parties.'" *Fayad v. Clarendon Nat. Ins. Co.*, 899 So. 2d 1082, 1086 (Fla. 2005) (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 33 (Fla. 2000)).

The rule of liberal construction in favor of the insured applies "only when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction," and the fact that a policy fails to define an operative term does not, by itself, create an ambiguity. *See Hegel*, 778 F.3d at 1220 (citing *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 942 (Fla. 1979)). When the insurer has not defined a term, the common definition of the term should prevail. *Hegel*, 778 F.3d at 1221. "[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291 (Fla. 2007).

### Florida Law on Late Notice

"Notice [to the insurer] is necessary when there has been an occurrence that should lead a reasonable and prudent [person] to believe that a claim for damages would arise." *Ideal Mut. Ins. Co. v. Waldrep,* 400 So. 2d 782, 785 (Fla. 3d DCA 1981); s*ee also, Yacht Club on the Intracoastal Condo Assoc., Inc. v. Lexington Ins. Co.*, 599 Fed. Appx. 875, 880 (11th Cir. 2015). Notice should be provided to the insurer without regard for whether the loss is covered under the policy. *See Kendall Lakes Towers Condo. Ass'n, Inc.*

*v. Pac. Ins. Co., Ltd.,* 2012 U.S. Dist. LEXIS 10749 at \*10 (S.D. Fla. Jan. 30, 2012). An insured's failure to provide timely notice is a legal basis to deny coverage under Florida law. *Mid-Content Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1335 (S.D. Fla. 2010). This includes late notice of supplemental claims. *See Rodriguez v. Liberty Mutual Fire Ins. Co.*, 2017 WL 838633 (S.D. Fla. March 2, 2017).

When an insurance contract contains such a provision, the insured must give notice of a loss to its insurer that implicates a potential claim without waiting for the full extent of the damage to become apparent. *1500 Coral Towers Condo. Ass'n, Inc. v. Citizens Property Ins. Corp.,* 112 So.3d 541, 543 (Fla. 3d DCA 2013). "Generally, the question of whether notice [was] timely is a question of fact for the jury; yet, 'when the undisputed factual record establishes notice is so late that no reasonable juror could find it timely, Florida courts will deem the notice untimely as a matter of law.'" *Ro-Ma Holdings #4, LLC v. Scottsdale Ins. Co.*, Case No. 20-21599-CIV-MARTINEZ/ OTAZO-REYES (S.D. Fla. Apr. 19, 2021) (citing *Clena Invs., Inc. v. XL Specialty Ins. Co.*, Case No. 10-62028-CIV-RNS, 2012 WL 1004851, \*4 (S.D. Fla. Mar. 26, 2012)). An insured is not relieved of its responsibility to provide prompt notice simply because it engages in independent repairs. *See Kendall Lakes Towers*, 2012 U.S. Dist. LEXIS 10749 at \*11; *see also Waldrep*, 400 So. 2d at 786.

Where, as here, a policy does not define "prompt notice," the term "shall be construed to mean 'that notice must be given with reasonable dispatch and within a reasonable time [i]n view of all the facts and circumstances of the particular case.'" *Ro-*

*Ma Holdings*, 2021 LEXIS 75860 at *6 (citing *PDQ*, 566 Fed. App'x at 845, 848).  Florida courts have found a six-month delay in reporting a claim to an insurance carrier as untimely as a matter of law. *See*, e.g., *PDQ*, 566 F. App'x at 849 (also affirming that there is no ambiguity in the phrase "prompt notice").  A delay of six weeks has been held untimely as a matter of law. *See Waldrep*, 400 So.2d at 785.

Prompt notice of a loss enables an insurer to conduct a "timely and adequate investigation" of a claim; breach of a policy's prompt notice provision results in a presumption of prejudice to the insurer, which may be rebutted by the insured. *See Bankers Ins. Co. v. Macias*, 475 So. 2d 1216, 1217-18 (Fla. 1985); *Ro-Ro Enterprises, Inc. v. State Farm Fire and Cas. Co.*, 1994 WL 16782171, at *3 (S.D. Fla. June 22, 1994).  If the insured cannot rebut the presumption, the insurance carrier is entitled to final summary judgment. *See, generally, Macias*, 475 So. 2d 1216; *see also PDQ*, 566 Fed. App'x at 849 ("Prejudice is properly resolved on summary judgment where an insured fails to present evidence sufficient to rebut the presumption.").

## **ARGUMENT**

### **The Undisputed Material Facts Show That Plaintiff's Notice Of Its Supplemental Claim Was Late And Scottsdale Was Prejudiced By Such Late Notice**

The Plaintiff waited over two years before notifying Scottsdale of its supplemental claim for Hurricane Irma damage to the Property. *See*  Statement of Material Facts ("Statement"), ¶ 13.  The Policy expressly requires an insured to give "prompt notice" to Scottsdale of a loss to covered property. *See id.* at ¶ 17.  The Plaintiff initially reported its September 10, 2017 Hurricane Irma loss to Scottsdale on September 18, 2017, which was

prompt. *See id.* at ¶ 7.  Scottsdale retained an independent adjuster, who inspected the Property with a roof consultant in September/October 2017 and again in January 2018 *See id.* at ¶ 9.  Based on the independent adjuster and roof consultant's inspection, reports, estimate and photos, Scottsdale issued a claim determination letter to the Plaintiff on March 13, 2018, which explained the damages that were not covered and Scottsdale's adjustment and payment for covered wind damages (after the wind deductibles) observed to the roofs of the Property, which would be mailed separately to the Plaintiff. *See id.* at ¶ 10.

Although the Plaintiff's initial notice of its loss to Scottsdale was prompt, the Plaintiff failed to promptly notify Scottsdale of its supplemental claim for damage to the Property from Hurricane Irma.  The Plaintiff acknowledged receiving Scottsdale's March 13, 2018 claim determination letter and the payment referenced therein. *See* Statement of Material Facts at ¶ 11.   The Plaintiff's representative said she did not deposit the payment from Scottsdale because she did not think it was sufficient to cover the damage to the Property from the hurricane. *See id.* at ¶ 24.  However, she did not notify Scottsdale in 2018 or 2019 of her disagreement regarding its adjustment of the loss, but rather proceeded to make numerous undocumented repairs to the roofs and interiors of the units at the Property. *See id.* at ¶¶ 13, 20. The first notice to Scottsdale of the Plaintiff's disagreement with Scottsdale's March 2018 claim decision was on March 24, 2020, when the Plaintiff reported its supplemental claim to Scottsdale. *See id.* at ¶ 13.

The Plaintiff's failure to promptly notify Scottsdale of its disagreement regarding the amount of loss to the Property from the hurricane and of its intent to make a

supplemental claim for benefits under the Policy is not excused because the Plaintiff was unaware of the full extent of the damage. *See Yacht Club on the Intracoastal Condo*, 599 Fed. Appx. At 880.   The Plaintiff's representative testified she disagreed with Scottsdale's adjustment of the original claim when she received Scottsdale's indemnity payment issued in March 2018. *See* Statement at ¶¶ 11, 24. She testified she did not deposit the check because she did not "think that was a fair amount that they sent me." *See id.* at ¶ 24. Even if she was not aware of the full extent of damages to the buildings from Hurricane Irma, as of March 2018, the Plaintiff disagreed with the adjustment and should not have waited for over two years to make a supplemental claim to Scottsdale.   During the time it delayed in making the supplemental claim, the Plaintiff performed numerous undocumented repairs of alleged hurricane-related damage to the interiors and exteriors of the buildings on the Property. *See* Statement at ¶¶ 18, 20-22, 25.   Therefore, the Plaintiff breached the Policy condition which required the Insured to provide "prompt notice" to Scottsdale of its supplemental claim for Hurricane Irma damage to the Property.

In all cases where an insured fails to give prompt notice to its insurer of a loss, prejudice to the insurer is presumed, and the burden shifts to the insured to demonstrate lack of prejudice. *See Lehrfield*, 396 F. Supp. at 1183.   An insured may carry this burden, and avoid summary judgment against it, by submitting evidence creating a disputed issue of fact as to: "(a) whether better conclusions could have been drawn without the delay[ed] [notice], (b) whether those conclusions could have been drawn more easily, (c) whether repairs to the affected areas that took place in the interim would complicate an

PD.40412449.1

evaluation of the extent of the damage or [the insured's] efforts to mitigate its damages, or (d) whether an investigation conducted immediately following the occurrence would not have disclosed anything materially different from that disclosed by the delayed investigation." *Id.* at 1184 (citing *PDQ*, 566 F. App'x at 849-50).

Florida courts have held numerous times that a presumption of prejudice to the insurer was not rebutted under similar circumstances as those in this case. *See id* at 1182. (holding that the insureds' proffer of an affidavit from their public adjuster, who had no personal knowledge of the condition of the insured property at the time of the loss, did not serve to rebut the presumption of prejudice); *1500 Coral Towers*, 112 So. 3d at 545 (affirming summary judgment for the insurer where, "[t]he closest" the insured came to rebutting the presumption of prejudice was a "conclusory statement" by one of its engineers that, in his opinion, "the late notice did not prejudice" the insurer); *Hope v. Citizens Property Ins. Co.,* 114 So. 3d 457, 460 (Fla. 3d DCA 2013) (finding  the insured's submission of a homeowner's affidavit, roofer's repair estimate and public adjuster's report listing repairs necessary to the structure were conclusory and did not overcome prejudice to the insurer); *Yacht Club*, 599 Fed. Appx. at 881 (granting summary judgment in favor of the insurer, noting the insured made certain repairs before filing the claim and that the ability to offer testimony regarding causation alone does not satisfy the prompt notice requirement).

The Plaintiff's representative testified that she did not contact a public adjuster to assist her in making a supplemental claim to Scottsdale until early 2020. *See* Statement at ¶ 14.  Hence, the Plaintiff's public adjuster has no personal knowledge of

the condition of the Property immediately after the hurricane in September 2017, or in March 2018 when Scottsdale issued its claim determination letter, or between March 2018 and early 2020 when the Plaintiff first retained the public adjuster.  The Plaintiff testified she had the roof patched after the hurricane "maybe three or four times" and completed some repairs to the interiors of units at the Property alleged to be damaged by water from the storm.  *See* Statement at ¶ 20, 22.  The parties' experts both noted non-conforming repairs to the roofs of the Property. *See id.* at ¶ 38, 43.  Although both experts found wind damage to the roofs of the Property, Scottsdale's expert, Mr. Ramirez testified he did not believe it was possible to determine when the wind uplift damage to shingles on the roofs occurred because of "multiple repair attempts to the roof coverings throughout all buildings contaminating what was originally there after the storm." *See id.* at ¶ 37.  The Plaintiff's expert, Mr. Munuswamy testified: "I'm not saying all the damages [on the roofs] are attributable to the wind because we observed creased shingles adjacent to the temporary repairs, so those things are attributable to the temporary repairs because the shingles are nonpliable. And we also saw some of the nonconformance repairs that – so I'm not saying all these damages that I observed on this roof are exclusively due to wind. I did not say that." *See id.* at ¶ 40.

A district court granted summary judgment in favor of Scottsdale on its late notice defense in a similar case, *Hemingway Villa Condominium Owner's Association v. Scottsdale Insurance Company*, Case No. 20-CV-24365-KMM, 2021 WL 2550456 (S.D. Fla. Aug. 19, 2021), finding that the Plaintiff had "failed to adduce evidence that rebuts the presumption of prejudice which arises where an insured fails to timely notify an

insurer of a loss." *Id*. at *9.  The district court ruled as a matter of law that a 611-day delay in reporting the claim to the insurer was untimely.  *Id*. at *10.  The court also ruled that the insured's expert's conclusory opinions, made without any personal knowledge of the condition of the insured property in the immediate aftermath of Hurricane Irma, were not sufficient to overcome the presumption of prejudice. *Id*. at *12.  The court noted that the insured's intervening repairs complicated the insurer's ability to evaluate damages in holding that there was no genuine issue of material fact that the insurer's conclusions as to the extent of loss could have been drawn more easily but for the substantial delay in reporting the claim. *Id*. at *15 (finding that the availability of aerial photos online insufficient to rebut the presumption of prejudice).

Although the independent adjuster and roofing consultant's inspections of the Property after the hurricane in 2017 and early 2018 allowed them to observe damages to the roofs at that time, Scottsdale was prejudiced in its investigation of the Plaintiff's supplemental claim made in March 2020 because of the numerous undocumented intervening repairs made to the roofs and interiors of the buildings at the Property. Had the Plaintiff promptly reported its dispute to Scottsdale in March 2018 regarding the extent of damages to the Property from Hurricane Irma, Scottsdale could have addressed the Plaintiff's concerns and retained a licensed engineer to inspect and provide an expert opinion regarding the scope of wind damages to the Property from Hurricane Irma *before* the Plaintiff completed any repairs to roofs and interiors.  Mr. Ramirez opined that wind damage he observed to the roofs was exacerbated by intervening windstorms. *See* Statement at ¶ 35. Mr. Ramirez also reported that repairs

made to the roofs since Hurricane Irma, some of which were faulty and likely caused further damage (Plaintiff's expert shared this opinion), contaminated the evidence, preventing him from determining the scope and extent of wind damage to the roofs from Hurricane Irma. See *id* at ¶ 37. This is the essence of prejudice.

The undisputed material facts in this case show that: (i) the Plaintiff seeks coverage under the Policy for alleged damages to the Property from Hurricane Irma in the range from $300,000-$380,000; (ii) the Plaintiff was aware of damage to the Property immediately after Hurricane Irma passed; (iii) the Plaintiff received the March 13, 2018 claim determination letter and undisputed payment from Scottsdale, but decided not to cash the check because she disagreed with the amount, but did not notify Scottsdale of a dispute at that time; (iv) the condition of the Property worsened over time due to intervening storms and non-conforming repairs; (v) the Plaintiff completed undocumented repairs to the roofs and interiors of several units prior to reporting the supplemental claim to Scottsdale; (vi) the Plaintiff is unable to provide any details or evidence regarding the nature, extent or cost of repairs it made to the roofs and interiors of the buildings of the Property due to alleged Hurricane Irma damage.

Based on the material undisputed facts of this case, the Plaintiff failed to provide prompt notice to Scottsdale of its supplemental Hurricane Irma claim.  Had the Plaintiff timely reported the supplemental claim to Scottsdale and its disagreement with Scottsdale's March 2018 claim determination, (i) Scottsdale's engineer could have drawn better conclusions about which damages to the Property were caused by

Hurricane Irma during the policy period; (ii) Scottsdale's investigation of Plaintiff's loss and identification of hurricane-related damages to the Property would have been uncomplicated by the Plaintiff's post-loss repairs to the Property; and, (iii) had it received notice in March of 2018 regarding the Plaintiff's dispute of the damages to the buildings from Hurricane Irma, Scottsdale's further investigation at that time likely would have disclosed conditions materially different from those discovered during Scottsdale's investigation of the supplemental claim over two later. Therefore, Scottsdale was clearly prejudiced by the Plaintiff's late notice of its supplemental claim to Scottsdale. *See, e.g.*, *Lehrfield*, 396 F. Supp. at 1184 (citing *PDQ*, 566 F. App'x at 849-50); *Ro-Ma Holdings #4, LLC*, Case No. 20-21599-CIV-MARTINEZ/OTAZO-REYES (S.D. Fla. Apr. 19, 2021); and *Hemingway Villa Condo. Owners Ass'n v. Scottsdale Ins. Co.*, Case No. 20-CV-24365-KMM (S.D. Fla. Aug. 19, 2021).  Accordingly, Scottsdale is entitled to final summary judgment as a matter of law that Plaintiff forfeited coverage under the Policy for its supplemental Hurricane Irma claim due to its failure to promptly notify Scottsdale of its supplemental claim.

### Alternatively, Plaintiff's Recovery Under the Policy is Limited to the Amount It Actually Spent to Make Repairs

In the alternative, if this Court does not grant summary judgment to Scottsdale on its late notice defense, Scottsdale is entitled to partial summary judgment that Plaintiff's damages are limited to the costs Plaintiff actually incurred to repair wind-related damages to covered Property prior to its sale of the Property.  Coverage A of the Building and Personal Property Coverage Form provides Scottsdale "will pay for

direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." *See* Ex. A-1. According to the Commercial Property Coverage Part Supplemental Declarations, valuation for the three buildings insured under the Policy is at "Replacement Cost." *See id.* However, the Policy states that Scottsdale "will not pay on a replacement cost basis for any loss or damage: (1) Until the lost or damaged property is actually repaired or replaced; and (2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage." *See id.* The Florida Supreme Court has explained that replacement cost damages do not "arise until the repair or replacement has been completed." *Ceballo v. Citizens Prop. Ins. Corp.*, 967 So. 2d 811, 815 (Fla. 2007) (citations omitted); *see also State Farm Fire and Cas. Co. v. Patrick*, 647 So. 2d 983, 983 (Fla. DCA 1994) (per curiam); *Buckley Towers Condo., Inc. v. QBE Ins. Corp.*, 395 F. App'x. 659, 664 (11th Cir. 2010).

The Plaintiff's corporate representative testified that she repaired some of the damages to the buildings from Hurricane Irma. *See* Statement at ¶¶ 20, 27. She testified that after the hurricane, she hired a roofer to patch and seal the buildings' roofs three or four times and hired a water mitigation company "who came in and did some drying up." *See id* at ¶¶ 20,21. Thus, coverage for replacement cost has arisen under the terms of the Policy. The Optional Coverages, Replacement Cost provision of the Policy's Building And Personal Property Coverage Form states in paragraph e. that Scottsdale "**will not pay more** for loss or damage on a replacement cost basis **than the least of** [the following:] (1) the Limit of Insurance applicable to the lost or damaged

property; (2) the cost to replace the lost or damaged property with other property. . .; or (3) **The amount actually spent that is necessary to repair or replace the lost or damaged property**." *See* Ex. A-1. (emphasis added).  The undisputed material facts show that the least of these amounts is the amount the Plaintiff spent to make repairs to the buildings after the loss.

As for the first option, the Commercial Property Coverage Part Supplemental Declarations pages state the limits of insurance for the three buildings covered under the Policy are $550,000 for Building 1, $367,000 for Building 2, and $433,000 for Building 3. *See* Ex. A-1.

Regarding the second option, the Plaintiff has produced two estimates upon which it bases its claim for damages in this case: (1) a United Claims Adjusters 7/30/2020 estimate for $343,118.81 at replacement cost; and (2) a T&E Group, Inc. 5/27/2022 estimate for $380,980.43 at replacement cost.  Both estimates include estimated costs to completely replace the roofs on the three buildings (one at $213,295.04 and the other at $230,757.53), to paint the exteriors of all three buildings, and to repair interior water damage to some of the units. *See* Statement at ¶¶ 30, 31. However, the Plaintiff's corporate representative testified she sold the Property "as is" in July 2022 for $2.7 million, which was $1.4 million more than she originally paid for the Property.  *See id.* at ¶¶ 47, 50. The Plaintiff sold the Property in July 2022 before completing the repairs stated in United Claims Adjusters' July 2020 estimate or those stated in T&E Group's May 2022 estimate. *See id.* at ¶ 48. The Plaintiff testified she was not aware of whether the purchaser of the Property knew of any issues with the

roofs; "I told them I'm selling it as is. I'm not fixing anything." *See* id. at ¶ 49. There is no record evidence that Plaintiff received less for the sale of the Property in July 2022 than it would have had the repairs stated in its experts' estimates been completed. The Plaintiff is not entitled to recover under the Policy the costs to replace the three buildings' roofs when she did not replace the roofs or incur those costs before she sold the Property "as is" in July 2022. Given that it no longer has a financial interest in the Property, the Plaintiff will never complete the repairs stated in the two estimates.

As for the third option, the "amount actually spent that is necessary to repair or replace the lost or damaged property," the Plaintiff testified it paid a roofer to make repairs to the roofs three or four times and had its handyman make repairs to the interiors and exteriors of the buildings after the hurricane. Although the Plaintiff has not produced receipts or other documentation for the hurricane-related roof and interior repairs it made to the Property, given the Plaintiff's testimony regarding the scope of repairs made to the buildings, the amount the Plaintiff actually spent to repair the damaged buildings clearly is the least of the three options listed in paragraph e. of the Replacement Cost clause and should be the measure of recoverable damages under the Policy for the Plaintiff's loss.

Therefore, based on the undisputed material facts, Scottsdale is entitled to partial summary judgment that the Plaintiff's recoverable damages under the Policy are limited to "[t]he amount[s] [the Plaintiff] actually spent … to repair" Hurricane Irma damage to the buildings before it sold the Property.

Respectfully submitted,

**PHELPS DUNBAR LLP**

*/s/ Patricia A. McLean*

Patricia A. McLean, Esq., Fla. Bar #129143
Amber N. Razzano, Esq., Fla, Bar #1026019
100 South Ashley Drive, Suite 2000
Tampa, FL  33602
Tel.:  (813) 472-7550 / Fax:  (813) 472-7570
Email:  mcleanp@phelps.com
amber.razzano@phelps.com
***Attorneys for Defendant, Scottsdale Insurance Company***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 30, 2022, I filed the foregoing with the clerk of court using the CM/ECF system, which will send an electronic copy to all counsel of record.

*/s/ Patricia A. McLean*

Attorney